Good morning. The first case we'll hear will be United States of America X-Rail Pilecki-Simcoe in Junetown v. The CHUBBInstitute My name is Timothy J. Matuschewski. My last name is called M-A-T-U-S-H-E-S-T-A-I. I represent the related within this cause of action. Will you be reserving any time for rebuttal? Yes, I'd like to request six minutes for rebuttal. Six minutes? Okay, that's granted. Thank you, Your Honor. Well, Your Honor, this case is an important case. In this case, a complaint was filed under the QTAN provisions of the False Claims Act, which appear at 31 U.S.C. 3730, subsection 3, which permits anyone to file a complaint against anyone who violates 31 U.S.C. 3729, which is the substantive provisions of the False Claims Act. 3729 is violated as relevant in this case when somebody knowingly presents a false claim to an officer of the government or knowingly makes or uses or causes to be made or used a false or fraudulent claim to get a false or fraudulent claim paid or approved. This case is an appeal from the District of New Jersey that dismissed the relators' Second Amendment complaint with prejudice. Of course, the United States declined to intervene in this case. So the relators are seeking damages on behalf of the United States, not for themselves, although they, under the statutes, they get a reward if they're successful in recovery. Can we talk about Rule 9b for a second? Sure, Your Honor. You say in your reply brief on page 2 that the court need not pass on the issue of whether Rule 9b applies because you say there are other reasons for verse. But I'm curious about that, since if you're right and we were to send this case back, wouldn't the court have to know what pleading standard is governing in any event? I mean, how could we avoid talking about whether 9b applies? You put in the paragraph where you say that the case is reversed, you put assuming arguendo that 9b applies. This case still meets that standard. So your view is that no matter what, you believe you've met the 9b standard? Yes, Your Honor. Okay. Well, with that in mind, can you address, if you would, the court's assertion that you just, at no place in your pleading and even after giving two opportunities to amend, you're still failing to get to the crucial point? And I'm looking in particular at A62 where the court is saying in response, this is on the motion for reconsideration, says, in both the second amendment complaint and proposed third amendment complaint, the relator's theory of scientra appears to be that the mere existence of compensation policies rendered TCI ineligible for participation in the Title IV program and that its continued submission of student applications for funds demonstrating knowingly false certification of eligibility. And then the court says that's your theory and goes on to say there's nothing in the way of specificity, I'm going to quote here, besides your conclusory allegations, there's nothing that TCI knew its compensation policies violated Title VII but nevertheless continued to submit. What's the response to the court's statement about that? Well, number one, Your Honor, regardless of what Chubb's policy was, written or otherwise, the law doesn't prohibit and the certification does not promise having or not having a policy that complies with the prohibition on improperly compensating student recruiters. It's the act of improperly compensating them. So, for example, if I had a match in New Jersey and I went to Alabama, you couldn't say that I went to New Jersey because that's where I planned to go. Well, if I'm understanding the district court's reasoning correctly, isn't the district court saying even if I were to assume, as a district court judge, that what they did would violate the law? You've done nothing to show that they had any knowledge or understanding, that the people in control of the organization acted with knowledge or with reckless disregard of the truth. You've given me no factual specificity. That's what I understand the court has said. And that's what I'm trying to get you to respond to. What can you want to do to show that the district court was wrong about that conclusion? Well, first of all, as I cited in the brief, a 12B6 or 9B is you're talking about, just to clarify that, just to let you know that I know what you're talking about, a 9B, if it applies, would require all allegations of fraud or mistake to be pledged with specificity. Right. Now, you're saying, well, when the judge says that the complaint was insufficient because it contained no allegations that they, Chubb, at all, acted knowingly when they presented false claims or made or used or caused made or used false statements, then how could your complaint comply with 9B? And my response to that, the first thing I would want to say is that the act of somebody doing something, if I were to come up to the bench and hit your honor, one could say, by alleging that I did that, that I knew what I was doing. The standard, the standard. There's a huge difference there between something that's clearly a deliberate act like a punch in the nose and a statement that what was done was in a technical violation of the law, and therefore they had to know it. I mean, that's the inferential leap you want us to take and you want the district court to take, and the district court said, I can't take that under 9B. You've got to tell me why they would know this, what it is about the facts of this specific case that would indicate that that inferential leap is justified. You don't have, you're referring to issues of proof, your honor, that don't apply to a motion to dismiss. No, actually he's talking about the allegations in the complaint, and so your response should be fairly simple. You should say, judge, if you look at paragraph thus and so, this is where we make the allegation that Chuck knew when it was applying that the application was false and its intent was to obtain money for false claims. That's what your response should be. Okay. We need only look to your complaint for the purposes of this appeal, right? Pardon, your honor? We need only look at your complaint for purposes of this appeal. Oh, absolutely. That's it. Rules of civil procedure and the complaint, because you've got to make sure that, you know, the complaint has to comply with the rules of civil procedure. So if you were to, there was a provision on my reply where I cited the paragraphs where knowingly was alleged, because knowingly, under 9b, the express terms of it, and that's Third Circuit, as hell, can be alleged generally. Well, that's really the whole point of, I guess, Chief Judge Brown's decision here, is that you don't just get to say knowingly generally in this context. Because 9b applies, you have to give enough specificity in your complaint that one could say, okay, that's why they knew. You can't just say they knew. You've got to say something about how or why they knew. Well, it's really, there was a section, there it is, and during my, how about it, during my break, I will cite, I'll look through the complaint and I'll cite the paragraphs in that regard. But in addition, I don't see any reason why a court rule that applies to fraud and mistake, like 9b, should apply to a complaint where the mens rea only requires knowledge or record disregard. I thought where we started here was that you conceded that 9b applies. I did not concede that. You don't concede that. I did not concede that. He asked me how, if they assumed, or how can we draft an opinion on that. I said, you could write a reassumed argument that 9b applies. Well, let me ask you this. Do you mind? No, no, go ahead. So let me ask you this. It would appear from the cases that were presented in the briefs before us that every circuit and the federal circuit has ruled that 9b applies to the FCA. So what? Not every circuit. Well, and we have some language that would appear that we're headed in that direction as well. Yes. If it's not every circuit, it's practically every circuit. The point is this. What basis is there for us not to apply 9b to an FCA, given the precedent, the overwhelming precedent by almost all of the circuits, if not all of them? Okay. The reason is because the court, this Third Circuit, makes its own decisions, except being bound by prior panel opinions of the United States Supreme Court. This Court has never held that 9b applies to a false claim to that case. And there are no allegations of fraud or mistake in the complaint. How do you explain this statement from U.S. ex-rel Schmidt v. Zimmer in footnote 9? Quote, we have held that FCA claims must be pleaded with particularity in accordance with Federal Rules of Procedure 9b. Close quote. You go back and you look at the case they cited, which was a case called the United States Ex-Rel Accord, and I forget the name of the defendant. But in that case, they were not evaluating a pleading standard, and they did not hold in that case. Well, if you didn't read it that that was the holding, my point is Schmidt v. Zimmer appears to read that as the holding. That case doesn't say we hereby hold or we hold that 9b applies. It says we have apparently held in the past. Well, you just inserted apparently, which isn't fair. Maybe I did insert it there. We have held that FCA claims must be pleaded with particularity in accordance with Federal Rules of Procedure 9b. How could we say it doesn't in the face of our own statement, and you're right, we're bound by prior panels, our own statement, that that's the holding of our circuit. Take a look at the court footnote 9. I guarantee you'll see that it was not held in that footnote or that whole case that 9b applied or false claims like this. Okay. Well, let's say you're right. That is a statement clearly. Dixon. Misinterpretation of a prior opinion. I don't really know how the court should deal with that, but according to this court it's not held that 9b applies nor is it supreme court. Well, we'll get you back on rebuttal. Thank you. Mr. Chairman. May it please the court. My name is Thomas Hilden. I'm an attorney for the defendants of the Chubb Institute, which I'll refer to as TCI and High Tech Institute. Michael McDonald at counsel table is counsel for the Chubb Corporation. We have chosen to divide our time up 10 minutes and 5 minutes between the two of us. Your Honors, I would like to list the four points that I would like to be able to make during the course of this and then discuss each of them and obviously whatever the court would wish to discuss. Number one, Chief Judge Brown correctly found that the plan by which TCI compensated its admissions representatives, its salary adjustment plan, complied as a matter of law with the Higher Education Act and the Department of Education's regulation under it. If that is true, then there is no false statement. Even if TCI had expressly said we are in compliance with the incentive compensation plan, even if they implicitly had said we're in compliance with all regulations  which it was not, there would still be no claim because the statement would be true. They simply, the means by which that compensation plan, which is attached to the complaint, put into play in the pleadings by the plaintiffs, that plan is a matter of law complies. Why don't you respond to your opponent's assertion that that safe harbor is a matter for affirmative pleading on your part and that it was improper for the district court to give you the benefit of an affirmative defense which you hadn't even pled. What's wrong with the legal reasoning that the plaintiffs put forth on that point? Well, there's a number of points. The first is that it was the plaintiffs themselves that put into the pleadings the plan which they said violated the law. One needed not go outside the pleadings for any facts to determine whether that plan violated the law. That doesn't really answer the point, though, does it? Their point is this is not an automatic thing. It's not a matter of them making their case. It's a matter of you having an affirmative defense. And so until you raise the defense, it shouldn't be a matter for dismissal. I'm glad I take it as their argument. Maybe I got it wrong and I'll be corrected by Mr. Matuszewski, but that's what I understood them to be arguing in their brief. Well, if the point is it is not an affirmative defense. Let me state that first of all, Your Honor. It is not an affirmative defense because the statute says you cannot pay a commission bonus or other incentive payment. Commission bonuses are one piece, but they're paid one at a time. Salary is fixed income over a period of time for services rendered. So on its face, you wouldn't think salary to be included within the statute. Second, the regulation itself, a subsection A of 34 CFR 668.14b.2, says that that first safe harbor is in fact something that is not a prohibited procedure. It is not covered by the statute. So that's what they're alleging. They're alleging something that is not even covered by the statute. Well, you know, there also is the issue about the effective date of the safe harbor provision. 2000, what is it, July 1st, 2003. That's correct. A lot of the allegations in the complaints are well before that. The only specific allegation in the complaint, and the one we're talking about now, is the salary adjustment plan. That plan is in the appendix and is dated September 2003. There's a second plan that was dated 2004. Those votes come after July 1st, 2003, and those are the first allegations about this plan and the safe harbor. Point number two is that the statute, when initially enacted in 1992, had language that the court is aware of about payments not being made directly or indirectly. Congress was concerned that the word indirectly could be read very broadly. In a conference committee report, which is cited in our briefs, Congress specifically said this statute does not mean that schools cannot make merit-based adjustments to salary, provided that those adjustments are not based solely on the number of students recruited, admitted, enrolled, or awarded financial aid. So what the U.S. Department of Education did in 2003 was essentially codify what Congress had said in 1992. So that was always part of the statute, or as Congress intended the statute, and shows moreover why it's not an affirmative defense. The third point is that if it was reasonable for the U.S. Department of Education in 2003 to interpret the statute as permitting semiannual salary adjustments, it certainly would have been reasonable for a school to have done so beforehand. But the bottom line is that the only salary adjustment plan they have pointed to with particularity is one which began after the effective date of the statute. What's your fourth point? I actually have a question. Repeatedly you point out that a lot of these arguments made by your adversary are waived because they were brought up too late in the process. Which arguments exactly are they? I mean, I think you even say the 9B argument has been waived, right? No. What we said is they hadn't alleged that 9B doesn't apply in a False Claims Act case until appeal. So they say that's a waiver? Yeah. Aren't you saying then that it's waived? They can't raise it for the first time on appeal, can they? Or do you think they can? We don't think it matters. We think 9B was absolutely that the district court judge clearly was correct in concluding that there had been no facts to permit even a plausible inference under the 12B6 standard of Iqbal and Trombley that there was a knowing violation of the higher education. How about the State Farmer argument? Wasn't that as well? You had said that was waived because it was raised too late? We said it was raised too late, but we have addressed it, Your Honor, and I think it is. Okay, but again, is that waived? I mean, I understand you addressed it on merit. It's not. The question would be what is the standard of review? It was decided by the district court in their second motion for reconsideration. They had not raised those two arguments about the safe harbor and the affirmative defense and the effective date until a motion for reconsideration following the dismissal of prejudice after they had a motion to show cause why they shouldn't be allowed to amend their complaint, followed by their original opposition to the motion to dismiss. And none of those prior arguments before the court were those issues raised. And to raise them for the first time on a motion for reconsideration along this circuit is clear that it's correct to manifest injustice or a clear error of fact or law. They didn't even attempt to meet that standard, and they don't. And I would say even if you were to go back and do it de novo, clearly this was not the determination of whether or not the salary plan satisfied the regulations, the safe harbor, probably before the court. We didn't need to wait for a summary judgment motion to decide that. The final point I want to make is it just emphasizes the appropriateness of looking with some degree of rigor at allegations of knowingness in false statements in a case like this. This is not a case where TCI is alleged to have said affirmatively to the Department of Education when submitting claims we are in compliance with the incentive compensation statute. Did the district court apply the right standard? They make a lot about that in their brief and say the district court imposed too high a standard, that the Sienta reasoning was wrongly based on private securities litigation reform act law. What's your response? The responses are that the Burlington case they cite specifically said we're not applying the private securities act standard. What this circuit did then was said that in 9B case, they applied what they considered 9B to require. It requires something more than a mere conclusory statement here. And I think what the district court said was exactly what the court characterized in this doing, is saying you've got to show me something beyond a mere conclusion here, where the only allegation, even if it were true that they violated a regulation, that's not a false claim against the government. There's no allegation that when they initially signed up, applied to participate in these programs, they intentionally buy, hoping to get something, to get eligibility, and then withhold it from the government later. None of the allegations in the Hendo case are present here. Well, this would be the theory of implied certification though, right? And that's what all the claims are in this case. Isn't that correct? The implied certification theory? If there were, if this court were to adopt an implied certification theory, well, the district court assumed that one could state that the court would accept an implied certification. He didn't say what the parameters of that would be, whether like the Second Circuit, that it should be limited to implied compliance with regulations that are a condition of payment. This regulation is not a condition of payment. But even if it is, there still has to be 9b, specificity. And there has to be some pointing to facts that at least give a plausible inference of a knowing violation. And they haven't attempted that. Okay. Thank you, counsel. Thank you, Your Honor. Good morning, Your Honor. This is the court. My name is Michael McDonald, and I represent the Chubb Corporation. I would like to address a separate issue to the Chubb Corporation, but first I just wanted to comment briefly on two questions Your Honor has asked my co-counsel. With regard to 9b, whether or not that was waived, I think we pointed out in our brief that, in fact, the plaintiffs argued below that they had met the 9b standard and that 9b did apply to the False Claims Act claims. Secondly, with regard to the incentive compensation plans being a permanent defense, I wanted to point out that we also pointed out in our brief that in the Ninth Circuit, the plaintiff in the Bott case had accepted the argument that we're making that it's not a permanent defense and that it's appropriate to apply on a motion to dismiss, and also the Lee case out of the Second District of California. I just want to, I guess, step back and switch gears for just a moment with regard to the Chubb Corporation. The complaint in this matter alleges that the Chubb Corporation is an insurance company. They're not in the business of education. The complaint alleges that the Chubb Corporation is a parent corporation, actually a former parent corporation of the Chubb Institute, and back in 2004 sold the Chubb Institute to High Tech Institute. That's it. That's the only allegations of the complaint. So you shouldn't be here today, right? We shouldn't be even here on this appeal. Well, I'm glad you are here, but I understand your point. I'm happy to be here, Your Honor, and that's the point that we made in our brief, is the argument against the Chubb Corporation was abandoned after the second amendment complaint was dismissed. When the plaintiffs responded to the court's original clause, they made no argument with regard to the Chubb Corporation and the corporate bail cause of action. When the plaintiffs filed a motion for consideration, they made no argument with regard to the Chubb Corporation. When they filed their appeal, there's no argument in the held brief as to the Chubb Corporation. We filed a motion for sanctions under Article 38, and the proof is in the pudding, so to speak. In their opposition brief, they argue that, oh, yes, we raised a meritorious claim, but they don't tell you what it is. There's nothing in their briefs anywhere which would be sufficient to state a claim against the Chubb Corporation. And so that claim was abandoned back when the second amendment complaint was dismissed. It's been waived because it's not presented in their brief. Therefore, there's really no basis upon which this court could correctly reverse the district court's dismissal as to the Chubb Corporation and also as to the other parent corporation, in this case, HDI. Nothing's been said today about that. Nothing's been said in the briefs. I think nothing else needs to be said on the shorter side of the questions. Thank you. Thank you very much. Counsel, do you want to start by responding to the last attorney who spoke? Why shouldn't the court assess sanctions under Rule 38? Because of two reasons. The first reason being that because the case should be reversed as to his client because... There's no argument about that in the brief, is there? Yes, sure there is. Well, why don't you point it to us, and while you're at it, you could respond. In the same opinion that I was quoting from before the motion for reconsideration, Chief Judge Brown specifically says at footnote one that realtors initially sought to impose liability on the Chubb Corporation, Sarah, and then says the realtors did not seek leave to amend those claims in response to the courts having dismissed them. Yes. So, if you didn't respond to the dismissal below, and you don't argue it here, why are they here? Because the court didn't address the allegations that Chubb, the parent company, and the company that controls the Chubb Institute, Hytech, that they caused the Chubb Institute to present false claims. And that's argued in our briefing thoroughly. And specifically the requirements... Here we go. It starts on... Here we go, page 10, the reply brief. And it's just wild. You all are looking at that. I just wanted to point out that the standard review for this court, as it sits here, is the same as the district courts, Plenary and DeNovo. And for that proposition, I cite North River Insurance Company versus Cigna Reinsurance Company, 52 F. 3rd, 1194. We get that. Yeah. Hey, help me out. What language are you looking on on page 10, which speaks to the issue of the Chubb Corporation being liable on a... It starts on page 10. Take a gander over to... Wait a minute. At the bottom of page 10, it says... The second paragraph on page 10. All right. It says... Now, don't we have controlling authority in our circuit that says arguments raised for the first time in a reply brief are waived? This isn't a complaint. This isn't a new argument. Well, if it's not argued, whether it's in the complaint or not, isn't waived. And more to the point, given that Chief Judge Brown explicitly noted in your motion for reconsideration, hey, the Chubb Corporation and those folks, I dismissed all that and no action was taken to amend or challenge that. I'm having a hard time seeing how Mr. McDonald was wrong in his assertion that they don't have a place at this table. Right. Well, in the complaint as it stands, it's alleged that they violated the False Claims Act. In the North River case that I cited a few minutes ago, 52 F. 3rd, 1194, it states, it holds that... However, this is the Third Circuit. However, because an appeal from a denial of a motion for reconsideration brings up the underlying judgment for review, the standard of review bears with the nature of the underlying judgment. Where there is a mixed question of law and fact, the reviewing court should separate the issue into its respective parts, applying the clear and earnest test of factual component, the plenary standard for the legal, and the court also held in the same opinion. Well, hold up there a minute, Mr. Manischewski. So is your position that you can stand silent after the district court dismisses all the claims against Chubb, make no argument that the district court was wrong to the district court, do nothing to seek to amend the complaint to repair what the district court said was wrong, and say nothing in your opening brief on the point, and then in your reply brief in this court, argue that Chubb is responsible and that's enough to save your argument? We didn't know that they were going to come up with a theory that we didn't allege exactly what was alleged in the complaint against us. It would be like us alleging the car wreck, and on the appeal you bring up what wasn't correct. But there's also a separate motion under Rule 38, a separate paper. You responded to it, but… That wasn't filed until after we filed our principal brief. Regardless of what they were doing. I mean, the question isn't, they can't waive your argument for you. The question is, what did you do? And if the district court was wrong in its assertion in footnote one, in its motion for reconsideration opinion, then you should tell us that. But if the district court was right, that it dismissed your claim, and that you didn't do anything to amend, and you didn't argue anything further about it, then it's irrelevant what Chubb was doing. The question is, didn't you, by your actions, waive the arguments about Chubb being still in the case? In our primary, our first brief, starting on page two, we allege Chubb as being all the Chubbs together. So, our primary brief, we raised those issues. By defining Chubb as all the Chubbs. Yes, because every single sentence in which we say Chubb, we mean all Chubbs. Okay. I mean, you had an awfully, I mean, couldn't you just say, in any case, all defendants, just because some of them might have allegations against them? Everybody's covered? Well, we didn't say all defendants. I'm not saying literally we didn't. We didn't specifically name all the defendants. There was another defendant that we didn't name. Judge Greenway. Well, I want to go back to the question that Judge Gordon asked you and I asked you as well. Hi, Rex. Yeah. You got it. Look at page, you want an appendix number? Can you give me appendix 106? Well, are we looking at your third amendment completely or your second amendment? Second, but it's never a third file. Well, I know that. Oh. Second, Your Honor. I'm sorry. Very good. What paragraph? We're looking at paragraph 73, 74, 75, 76, 77, 78, 79. And you think that each of these paragraphs or all of them taken together, 73 through 79, satisfy the deficiencies that Judge Brown, Chief Judge Brown pointed out in his opinion. These paragraphs provide the 9B particularity that's required. Oh, absolutely. They do. So I don't know what the lower court judge wanted because what he wanted was the pleading that is required only by the private securities act, private litigation securities act. And I know that we can't plead a strong emphasis of scienter because that's not an element of the case. We don't show scienter. Scienter means intent to defraud, intent that one rely, you know, and they actually rely. Knowingly present false claims, all that requires is recklessness, the presentment of a claim that's factually, legally, or otherwise false. So, yes, it does comply with 9B, assuming argument that 9B applies as interpreted by other circuits. All right.  Thank you, Your Honor. Thank you, counsel, for your excellent briefs and argument. And we'll take the case under advisement. Next case is Funk v. Signet Group. Thank you.  Have a seat, please. May it please the court. My name is Robert Lesko. I'm with the law firm of Wilson Elsor, and I'm here representing the appellants, Connecticut General Life Insurance Company, which I'll refer to as CIGNA, Alcatel Lucent USA, or Alcatel, and the long-term disability benefits plan for management for LBA employees. May it please the court also I would like to reserve five minutes for rebuttal. That's granted. Thank you. Your Honor, this appeal involves a claim for long-term disability benefits under an employee benefit plan, which was established, funded, maintained, and administered by Alcatel Lucent USA, which is formerly Lucent Technologies. CIGNA is the claim administrator for the plan only. It does not pay benefits or is not responsible for the payment, fiscally responsible for the payment of benefits under the plan. Therefore, there is no conflict of interest. That is, CIGNA does not operate under a conflict of interest. Yet the court found there was, right? Yes, Your Honor. It's not clear to me why, Your Honor, because there was no contention either here or before the district court below that there was a conflict of interest. Do you have any idea what led to that assertion by the district court? No, frankly, Your Honor. What, I mean, an idea would be pure speculation. I don't know. It might seem pretty well done, but don't speculate. So the consequence of that error is what? The consequence, Your Honor, is we believe that the district court's review of the underlying claim determination was tainted or colored by that misapprehension regarding the conflict of interest. Well, but there's multiple factors to be considered here, right? I mean, it's not your point that it's just sort of a bright-line test. If they get this wrong, that's it. It's got to go back, per se, right? That's correct, Your Honor. There are multiple factors. Under MetLife v. Glenn, which the district court appropriately cited or would have appropriately cited had there been a conflict, the conflict would be a factor, and the degree to which that factor would be relevant would depend upon the significance of the conflict, that is, whether or not SIGMA was actually influenced by the temptation for self-dealing. And what the court did was it reviewed the factors articulated in Glenn, which may be reviewed to ascertain, and stacked up sort of to ascertain whether or not the underlying claim determination was without reason because the factors might be so heavily weighted. However, the factors in Glenn also go to determine the significance of the conflict, and I think that is how the district court below misunderstood the standard. For example, if one were to look at an award of Social Security disability benefits, that, of course, is a factor to be determined or to be evaluated in whether or not the claim determination was actually reasonable. In the case of a claim administrator operating with a conflict, the failure to expressly state why the Social Security administration decision was or was not credited might go to increasing the degree of conflict and therefore tipping the scales in favor of an arbitrary increases review. That's what happened. Help me out, Mr. Lesko. In response to Judge Chigares' question, is your position that if it was error, and we know you're asserting it was error, for the district court to say, hey, there's a conflict here, that that by itself means the case has to go back? And if that's not what you're saying, I have another question for you. Your Honor, that's not what we're saying. May I clarify? Yeah. What we're saying is, firstly, this court exercises a plenary review, of course, and therefore it's not that the decision below is irrelevant, but this court gets to look at the record all over as though there was no decision below. And we submit that if this court does that and weighs the factors, this court will see that there is substantial evidence. That is, evidence upon which reasonable minds could find that statement was correct, even if it's wrong. Of course, the district court said you didn't follow your own plan, and that was highly problematic. What's your response to the district court's assertion that you were obligated by the terms of the plan to make some kind of an assessment to figure out whether he could earn 60% of what he had been earning before? I think it's a vocational analysis, right? You were obligated to do something, and you did nothing. Your Honor, there again we respectfully disagree with the district court below, and here's why. This plan, the definition of disability, has two parts. Within the first year, the participant is only disabled if they are found to be disabled from their own occupation, even if the participant can do another occupation. Right. And I don't think anybody argues that there was a problem with Phase 1. It's all about Phase 2 here, right? Right. So in Phase 2, the question is whether or not they can perform any occupation for any employer. And if they can, they're not disabled, provided that that occupation they're found to be able to perform would provide at least 60% of pre-disability pay, eligible pay. In this case, Cigna found during the second phase that, hey, Mr. Funk's limitations, not to say anything about the diagnosis, but the limitations imposed as a result of the condition, are no longer severe enough to preclude him from doing his occupation with LUCIN, any occupation for any employer, including his occupation for LUCIN. So if he could perform his occupation for LUCIN pre-disability, then by definition, logically, he must be able to earn at least 60%, in fact, 100% of his pre-disability income. So we found that he was not totally disabled under even the more restrictive standard during the first year, more restrictive in Mr. Funk's favor, that is. So you're relying on Dr. Quiam's opinion, right? I mean, he's the one who said Funk could work in a supportive, low-stress environment, but there was still no vocational analysis, and also, didn't Dr. Quiam also say he'd defer to vocational experts, which, of course, never materialized? I don't think that, respectfully, Ronald, that's a fair reading of the record. Now, there was a peer-to-peer review between Dr. Quiam and Dr. Pinchot, or Quiam, I'm not quite sure how to pronounce that. There was a peer-to-peer review, which was recorded by way of sort of notes, a narrative by Dr. Quiam. And he said, in response to Dr. Pinchot's suggestion that Mr. Funk couldn't even mop floors, he said that he could probably perform low-stress, low cognitive demand. In other words, he could mop floors, but that's irrelevant. And then Dr. Pinchot suggested, and this is where there's evidence of a tenant-physician bias as an advocate. He said, oh, yeah, but that doesn't meet the 60% salary requirement in the plan. That's where Dr. Pinchot said, well, I'll leave that to the experts. But ultimately, that was just an interim conference between the two doctors. That was not the basis of the decision. Ultimately, Dr. Quiam, and more importantly, Cigna, the claim administrator, determined that Mr. Funk could perform his occupation, and therefore no vocational analysis was required. We weren't in some occupation. Part of the issue that the district court came up with in analyzing this is that the district court queried what was different in the information available to Dr. Quiam that led to a difference in the ultimate conclusion from what Judge Chigueras just read you to the determination that Mr. Funk could, in fact, do his own job. And that was a major part of the reason for the court's conclusion. Your Honor, what Judge Chigueras just read to us was not a determination by Dr. Quiam. That was merely a narrative in a peer-to-peer review notes. His ultimate determination was that, or his determination after initially finding limitations, was that his condition, or the limitations relating to his condition, had changed so that they were no longer severe enough to limit him from performing the requirements of his job. But my question is this. There must have been something that the doctor saw to come to the conclusion that he, Mr. Funk, would be able to work in a low-stress environment. Let me see now. I don't have the exact words right in front of me, but I know the quote I'm talking about. I do. And my question is, what is there in the record to help us in reviewing this, that there was a substantive difference in the information provided between Dr. Quiam coming to that conclusion that a low-stress environment would work for Mr. Funk at whatever point in time that was, and then his ultimate conclusion that he indeed could work at his old job and function properly in that job? I understand your question, Your Honor, essentially what changed in his condition. But the question I perceive, I think correctly, is based upon a misunderstanding as to what Dr. Quiam's initial determination was. I'm sorry, I've got that tuned in my mind now. I like country weather. My sincere apologies. You'd all be in trouble for that. If everybody else checks their phones. Your Honor, may I continue? Yeah, could you start again, please? Sure. I think I understand your question. You're asking me what changed in the limitations so that, you know, to change from the initial opinion of Dr. Quiam to say that he's severe is from a severe psychotic episode and can't work, to then saying he can work. But your question, as part of your question, you state that, and I don't think, I think it's incorrect. Dr. Quiam never concluded that Mr. Funk could only work in a low-stress, supportive environment. That was just a note, a passing note in a conversation. The ultimate determination, the initial determination of benefits, that is, and the ultimate appeal, which is really the most relevant here, but that determination was based upon a finding that Mr. Funk could perform his occupation, not a low-stress, cognitively supportive job. It was his job. Now, here's what changed, Your Honor. What changed was Dr. Quiam found that he no longer suffered from severe symptoms. It was the severe symptoms which led to the impairment from performing his occupation. For example, the records demonstrate, and Dr. Quiam notes that the records show Funk is not suffering from severe symptoms. For example, he no longer is drinking alcohol. That resolved. He no longer is manic or psychotic. Dr. Pinchuk told him that during the peer-to-peer review, which is at page 220 of the appendix. In addition, the symptoms, I mentioned he's not abusing alcohol. He was now diagnosed with bipolar disorder. However, there was no information, no notes to support the diagnosis during the relevant time period. There was no information regarding the extent of the symptoms provided by Dr. Pinchuk. What Dr. Quiam did note was that Mr. Funk was no longer manic or psychotic. He was only depressed. Now, Dr. Pinchuk said severely depressed, but Mr. Libby, who was the therapist who saw him more often than Dr. Pinchuk, said that the depression was under control. But Libby, as well as Pinchuk, the Social Security Administration, and others, all came to similar conclusions. That is that he couldn't work. Your Honor, the appellants submit that that conclusion is unreasonable. Or, if not unreasonable, it's not supportive. More importantly, the contrary evidence is sufficient upon which reasonable minds can find that suggestion. Is there a point where your client then gets some sort of independent medical examiner or at least a vocational expert involved to help explain the change in direction? Yes, Your Honor. Sigmund did do that. In fact, you've got a medical examiner, you've got Dr. Shipko involved, but you never got a vocational expert in there to say anything about whether this man could work or what kind of environment he could work on. I mean, if I understand the record right, it had a neuropsychologist, you didn't, but Dr. Panza saw him for a day, did some tests. And then you had Dr. Kham and Dr. Shipko, who never saw him but reviewed some records, make some comments. That was the limit of the investigation. And based on that, said, well, we think you can still do your job. If I got the record right? Respectfully, Your Honor, I don't think that's a fair characterization of the record. For one thing, Dr. Panza was a neuropsychologist. He did a two-day exam. He administered 20 objective tests, and almost all of those tests showed a high level of cognitive function without any impairment based upon mood disorder, depression, anxiety, or anything like that. Now, I ask rhetorically that if Cigna had hired Dr. Panza to do that examination, would we be standing here? The fact of the matter is that his doctor, Mr. Funk's own attending physician hired Dr. Panza to do that analysis, and it fully supports the denial. Dr. Shipko did much more than just look at some records and make some notes. Dr. Shipko did a detailed analysis. And if Your Honor, You say a detailed analysis, what do you mean? When I said he reviewed the records, that wasn't an insult. I'm just saying that's what he did. He never examined Mr. Funk. He looked at the records, right? That's correct, Your Honor. Okay. The examination was done. I didn't take it as an insult. I just wanted to make sure. You may sound like, well, it was a really detailed analysis. Yeah, I'm sure he did a good job for you. That's not my implication. What I'm saying is the district court appeared to take the view that this was a decision that was made in the face of the Social Security Administration's decision, in the face of his treating physician, in the face of his treating psychotherapist's opinions, and that in light of those things, this was not enough. But your position, I take it, is clearly it is, right? Clearly it was, Your Honor, and as I'm sure the court has already done, a review of Dr. Shipko's report shows that he specifically addresses various points raised by Dr. Hinchhuff and Dr. Libby, and it is point by point. It's not just a willy-nilly acceptance of Dr. Shipko, and also the notes in the file, the claim notes in the file indicate that the claim reviewer from Cigna considered all of that. Thank you. Thank you, Counsel. Good morning. May it please the Court. Stephen Goechter on behalf of Attalee, Robert Funk. Your Honors, I'd just like to address one of the questions that was raised about Dr. Kion's opinion. I noted that counsel indicated that it was simply a passing reference in some peer-to-peer review report. That's not the case here. Cigna adopted his decision, his opinion, in their first denial of August 22, 2006. It's at page 359 of the appendix. That indicates, while we respect Dr. Hinchhuff's opinion that he feels you are unable to work, and I'm quoting directly from the decision of Cigna, which is being reviewed here, there is no clinical evidence to support that you would be unable to work in a supportive, low-stress, low-cognitive-demand environment. That was the basis of their decision. Is that the decision that we're reviewing? You just said that's the decision we're reviewing. But aren't we reviewing the last, the final decision? There was another appeal after that, right? That's correct, Your Honor. And every appeal within that administrative system is deniable, right? Yes, but I think this points to the procedural irregularity here of how they approach this entire case. I think the case law indicates— Before you go there, help me out with this. Is it or is it not the final decision that we are reviewing? No, it's the entire process, Your Honor. So if they had come to a decision on entirely new evidence that was clearly sufficient in their last step, you would say it's still reversible if they made a mistake in an earlier step? If there was some entirely new evidence that came up. But what had happened here, I'd like to put it into context about the process, because in these ERISA review cases, when you're looking at the arbitrary and capricious standard, it is about the process and how they arrived at the final decision. I agree the final decision is what's reviewable, but we need to put it into context. Cigna first terminated Mr. Funk's benefits on the basis of their determination, which is clearly stated in their denial that he could work in a highly supportive, low cognitive demand, low stress environment. They didn't address their definition of disability. Mr. Funk engages counsel and engages in an appeal. And on his appeal, he argues to Cigna, hey, you didn't follow your definition of disability. Your definition of disability requires that I earn $47,000 a year in an occupation. There's no analysis of whether he could do his regular occupation, any occupation, or earn $47,000. So he points this out to Cigna. Cigna, instead of addressing the vocational issues, instead of addressing the Social Security finding, instead of addressing their original paper reviewer's finding, simply sends it out to another reviewer. And now the new reviewer says... Well, when Cigna sends it out to another reviewer, is that not something they're entitled to do at that rate? Is that a wrong thing for them to do, or are they entitled to do that? Absolutely not. They can send it out to another reviewer, but they didn't address Mr. Funk's appeal. What they did was simply get another medical reviewer, a non-examining expert, to say something totally different. He has no restrictions. Therefore, he can do anything. And if, under our standard of review, if they have a medical expert who says he can do, he can work without restrictions, and therefore they say, well, you can go back to your old job, is there a logical flaw in their assertion that that does meet the 60% requirement? Yes, there's definitely a flaw, because they failed to reconcile two of their own consultants' opinions. I mean, what you have is the treating doctor saying one thing. I think even if we disregard the opinions of the treating physicians in this case, if you boil it down, we have two medical experts hired by CIGNA who differ as to the extent of Mr. Funk's restrictions. Assume that's right. What's our standard of review? Is it not that they have substantial evidence to support their position? That's correct, but the decision has to be reasonable. So if they've got somebody that says what they say the person says, are they entitled to rely on that? Not if it can't be reconciled with their first expert, and I think that's my point here, is that here you have a divergence of opinion. In fact, even in their, I believe in their reply brief at page 8, they indicate Dr. Shipko is under no obligation to even discuss Dr. Kayyem's differing opinion when they're discussing our burden of proof. The procedural irregularities and anomalies are something that are looked into in the RISA LTD benefits review determination by the court. It's not just simply substantial evidence. It's also whether they reasonably proceeded here, and there's numerous instances in this record under Glenn, other than the financial factor, we did not raise the financial conflict. It was thrown into the opinion. It was a one-sentence decision, but we think this court can exercise plenary review and look at Judge Hochberg's decision here and see that she relied on at least five or six other factors. How would that play out? Do you concede first that there's not a conflict here? Yes. Okay. So if there's a weighing process going on here post-Glenn, and one of the factors, and clearly an important one is whether you've got a conflict or not, and she says there is, and everybody in the case agrees there's not, is that in and of itself enough to say, well, we don't know how you would weigh this if you didn't have a false factor in the mix? You've got to look at this again. Well, the court has plenary review of this case, Your Honor, and I think it serves no useful purpose. And I think you can also look at Judge Hochberg's decision and see that she is very well thought out on all of the other factors under Glenn. The financial conflict was just thrown in basically in one sentence in a footnote. However, there are numerous other instances. The reversal of a benefits determination without additional evidence, disregarded opinions relied on, self-serving selectivity in the use of evidence, and self-serving paper reviews of the medical problems. So I think Judge Hochberg considered many things that this court could ignore the financial issue and still say that this decision is arbitrary and capricious under post-Glenn factor analysis. Can I ask about Sarah Bach? Yes, Your Honor. It's a counter-claim. Right, it's a counter-claim issue. Yeah, sorry. The counter-claim she gave summary judgment to folks on as well, denied theirs, and said that she actually cited Sarah Bach. But I was curious about how that applies here. It appeared to me that the Supreme Court was actually distinguishing the Knudsen case, and in effect saying, in that case, they just didn't plead it right. In this case, it doesn't matter. Now I'm paraphrasing what I understand the holdings of asking you to respond. It doesn't matter that the monies aren't in the hands of the plaintiff at the time that the insurance company says, I want to get reimbursed. And it doesn't matter whether the monies leave the insurance hands. It's enough that there's an identified sum of money that's agreed upon by the parties pursuant to their earlier contract in order to require them, as an equitable matter, to reimburse. Now, that's how I thought Sarah Bach was coming out, and I'm asking you to tell me whether you agree or disagree, and if you disagree, why. We disagree. Sarah Bach still required that there be a fund. And, in fact, in Sarah Bach, it was a reimbursement claim for medical benefits paid by the Tenebrosa plan, where the monies were being held in an attorney's trust account. Isn't that the Knudsen case, where it was held in a trust account? I think Sarah Bach indicated it was held separately. I thought there was an impersonal account there, which could be wrong. In any event, the court said the requirement was not met in Knudsen because the funds to which petitioners claimed their entitlement were not in Knudsen's possession but had instead been placed in a special needs trust. And that was the basis on which they distinguished Knudsen and said, that's different here. We're not talking about equitable restitution, though. He was talking about equitable restitution. He says, here we're talking about something different. We're talking about pursuant to an agreement, an equitable lien by agreement. Well, actually, the counterclaim is based on equitable restitution. That's the words used in Signa's case. But your client, I mean, the funds didn't go into your trust account, I assume, right? No, no. They did not. They did not. In fact, Mr. Funk was represented on the Social Security appeal by Signa's own subcontractor, Advantage 2000. And was not represented by me to that extent. So your argument is Knudsen applies, not Saraboff. Yes, Your Honor. And we also rely on a lower court case, Reichert v. Liberty Mutual. I believe it's a New Jersey District Court case. Let me ask you this question. If I understand you correctly, the procedural anomalies are so great that even if Mr. Lesko argues that our view of the medical evidence before us is there's substantial evidence to conclude that he's not disabled, your argument is the procedural anomaly potentially outdistance all of that so that, in your view, we can affirm on the district court's determination of arbitrary and subversive. Let's correct it to the extent that the standard really is substantial evidence, unreasonable, or clearly erroneous. And we don't concede to, we're arguing that there was a lack of substantial evidence supportive of Signa's decision. But the courts have held that you just don't look at the end result, you look at the procedure implemented. I'd just like to state a few words on the neuropsychological evaluation that has been put on a pedestal here. That neuropsychological evaluation was correctly, I think, dealt with by the district court below. Number one, cognition was never an issue in this case. Dr. Kayyum, when he first approved of this claim, indicated that Mr. Plunk's cognition was intact. If you look at the DSM-IV, the Diagnostic Statistical Manual, it lists cognition as only one of nine symptoms to be considered when we're analyzing whether a person has objective evidence of a depression. You look at hopelessness, helplessness, suicidal thoughts, paranoia, all of which the treating doctors indicate Mr. Plunk exhibited. So it's not just cognition. I think they're taking and providing undue reliance on that single evaluation. They are entitled to rely on it, though, aren't they? Yes, but it doesn't stand for the proposition that he's not disabled. I think they were taking it for the proposition that he was not cognitively disabled and then relying on Dr. Shipko to say he wasn't sufficiently depressed. Is that not how they were dealing with it? That's correct. But we would submit that Dr. Shipko's opinion doesn't bother to reconcile with his previous consultant, SIGMA's previous consultant, and that's where the fault lies. Changing gears just a little bit, I mean, there's no general duty to conduct a vocational analysis before making a decision, is there? That's a correct statement of the lawyer, Your Honor. Okay, so why in this case was it a mistake? Because there's no substantial evidence supportive of their determination. It goes to the substantial evidence standard. The plan says you must be able to earn $47,000 a year given your restrictions, and there was no evidence of that here, particularly in light of the fact that the reviewer said he could only work in a highly sheltered type of workshop. Okay, but I guess the question is, isn't it within their purview to change their mind? And if they changed their mind, why would they still be required to make the vocational determination? Well, they changed their mind based on they picked and choose between two of their consultants. One consultant says he has what seemingly would be significant and very disabling restrictions of having to work in a sheltered workshop, and then they just ship it out to another consultant until they find a consultant that says, yeah, he's got no restrictions. Well, no, I thought my point was slightly different. If we believe that Dr. Cleum at a point in time said he would excel in a low-stress environment and that at another point in time Dr. Cleum changed his mind, then his subsequent decision and the decision of Dr. Shipko are not at odds. That's correct, but Dr. Cleum didn't change his mind. They just sent it out to Dr. Shipko. Well, Dr. Cleum saw him at two different points in time. Reviewed the case at two different points in time, right? That's correct, when he was initially approved and then when he was terminated 11 months later. I wanted to respond to Mr. Lesko's assertion that the comment about low-stress environment, that was something that came up in the course of Dr. Cleum's peer-to-peer discussion with Dr. Pinchuk. It wasn't part of his ultimate decision. It was part of Cigna's ultimate decision.  So it's not so much that there's a conflict between Dr. Cleum and Dr. Shipko as it's a conflict between Cigna's expressed reason on its first decision and its reasoning on its second. But they're based on two different medical opinions and solely based on that. So your position with Dr. Cleum never changed his mind. The only time he expressed a view was in that peer-to-peer conversation, colloquia, whatever. That's correct. He did, it was expressed as his, he indicated that I was having a telephone conference. Dr. Pinchuk said, I don't think you can work. And I said to Dr. Pinchuk, I'm paraphrasing, that I don't think, I think you can work in a supportive low-stress environment. And that was put into Cigna's decision. That's what they hung their hat on here on their initial decision. That rather than address Mr. Funk's appeal and get a vocational analysis, they sent it out to another expert who gave them a decision that they ultimately relied on. Thank you, Your Honor. Thank you. Your Honor, I would like to pick up the discussion with the notion that Cigna's ultimate decision, or even its initial claim termination, was based upon the ability to perform in a low-stress, cognitively supportive environment. First of all, I think the Court understands that is not the relevant inquiry. That is not the relevant point in time for this Court to consider. The relevant inquiry is whether or not Cigna's final claim determination was arbitrary and capricious, or conversely, whether it was reasonably supported by substantial evidence in the record, Your opponent here says you can't make that judgment just looking at the last decision. You have to look at the whole process in order to put that in context. What's your response? My response, Your Honor, is that the final decision is the relevant decision. And if that decision is at least reasonably supported by the record, then the decision must be left undisturbed by the Court under arrest and the discretionary review. The process is not irrelevant. The process may be relevant. It's most relevant in circumstances where there would be a conflict of interest to ascertain and instruct the Court as to the level of the conflict or the level of the self-dealing influence under which the claim administrator was dealing. But back to the point, while Cigna's claim reviewer didn't note that statement in the initial letter, initially terminating the benefits, that was not the final word on the subject because about a week later, Cigna received Dr. Panza's report. Again, it was a two-day, in-depth evaluation by his attending physician. After reviewing that report, after Dr. Kayham reviewed the report, he issued a supplemental opinion, which is found on page 85 of the joint appendix. And if I may, Dr. Kayham's opinion was that, he says, my opinion, or the neuropsychological evaluation further supports my opinion that there is no evidence of psychiatric or cognitive functional impairment to preclude the claimant from work capacity. Testing also indicates that the claimant had a moderate level of depression which should not preclude him from work capacity. And then Cigna issued a further letter explaining and clarifying. Excuse me, what page were you just reading from? I'm sorry. It was joint appendix 85, Your Honor. It's the title of the case, follow-up task, general follow-up, and that's an entry by Dr. Kayham. So is the assertion that there's a conflict between the two experts that Cigna put in the mix here, is that contention false? Well, it's mistaken, Your Honor. Let's put it this way. We don't agree with it. Dr. Kayham stated that Mr. Funk could work. And in a letter dated August 22nd, I'm sorry, in a letter dated September 15th, Tiffany Ackerman, the disability claim manager, indicates that the information referring to Dr. Kayham's report was reviewed through one of our nurse case managers on staff. She doesn't mention Dr. Kayham, but clearly he looked at it too. And she says, it does not change our prior decision, this is the quote, it does not change our prior decision, and that prior decision being, you are capable of performing occupational activities. I'm sorry, I don't know that I gave you the page, Your Honor. I beg your pardon. That's page 215 of the joint appendix. I have it. Okay. So the third paragraph, the first line I read, the information was not reviewed or was reviewed by our nurse case manager, and it does not change our decision. I'll read the rest of the paragraph. It says the results of the neuropsych examination indicated that your cognitive function, including all aspects of your memory ability, which sounds like what Dr. Kayham said, are in fact, and that based upon your cognitive function, you are capable of performing occupational activities. So that's their determination now. But I guess I go back to Judge Gordon's question before, that cognitive impairment wasn't an issue. It was always concluded across the board that he was cognitively impacted. I guess they're saying to us, this just misses the point. Nobody said he couldn't think. They said he couldn't function because he was severely depressed, and Dr. Panza's report doesn't speak to that at all. It just addresses something that nobody was ever disputing. First, Your Honor, cognition was clearly an issue. The claim was based upon confusion, psychotic thoughts. I mean, I'm not a doctor. I'm not a psychiatrist, but that all relates to cognition. Can you think clearly? Can you make decisions? The decision-making was noted as severely impaired. So cognitive function is clearly a part of that. What's more, Dr. Panza clearly does say that his cognitive function, well, I can't say it as eloquently as Dr. Panza said it. He said at page 357 of the Joint Appendix, he said, Robert Funk's cognitive function, including every measured aspect of his memory ability, is intact. Thus, there is disparity between self-report, et cetera. He goes on to say that Mr. Funk was pleasant and cooperative throughout this examination. An appropriate amount of effort was applied to all tasks without any signs of frustration. There was no noted tendency toward mental fatigue, which was a noted limitation initially. Distractibility, noted limitation. Impulsivity, noted limitation. Or lapse in concentration, which was also severely impaired on the initial claim. So clearly, Dr. Panza's report said much more than Mr. Funk would have you believe it said. And I commend it to the Court's reading. I think based upon Dr. Panza's report alone, the claim determination is at least reasonable. It's not entirely correct. And I would reiterate, as the Court is aware, even if your honors believe that, I'm sorry, I'm over my time, but even if the Court believes that it was ultimately incorrect, if it's reasonable and you feel like some reasonable minds could differ, then it should be upheld. Thank you, counsel. Thank you for the excellent briefing and argument, and we'll take the case under advisement. Last case of the day is Chahaza v. Attorney General. I probably got the pronunciation wrong. Thank you. You may proceed. Good morning. Good morning. Tanisha Maskey-Mesley in Soloway, T.C. Pro Bono Counsel for Advisor Chahaza. And with me today are Pro Bono Co-Counsel Lindsay Grantfield and Alita Lasker at the table from Cleary Gottlieb's team in Hamilton. Your Honor, that was a request that I be allowed to redress three minutes of my time for rebuttal. That will be granted. Thank you. May it please the Court. We are here today because without this Court's intervention, Mr. Chahaza will be forced to re-litigate removed proceedings in the face of no new evidence whatsoever and years after the Board of Immigration Appeals reviewed this exact same record and upheld the immigration judge's asylum grant. Was there a real prejudice to just letting the process – I mean, I know it's one of the arguments your co-counsel made. Is there a real prejudice to just letting it run its course? You get a chance to litigate and you can always appeal to this Court at the very end. Your Honor, absolutely there is real prejudice here. And Mr. Chahaza has already been through the removal process. He's already litigated fully his case. And he won. He won years ago. His case became final years ago. The BIA had the opportunity to review the exact same record that it has now reopened in the face of no new evidence whatsoever. And it absolutely would be a prejudice to Mr. Chahaza to force him to re-litigate after his case has become final, especially when there is a presumption in the law and in the BIA's own regulations that there is finality in decisions. So, I mean, one of the chief issues in this case regarding habeas is whether your client is in custody. I think we all understand that that doesn't necessarily mean you have to be incarcerated. So, maybe you can move to that. Yes, Your Honor. The District Court erred in holding that Mr. Chahaza was not in – did not meet the in-custody requirement because he was not in physical detention. And that's something that the government doesn't even contest. The standard here is whether Mr. Chahaza is subject to restraints on his liberty, not suffered by the public generally, and the facts and circumstances of his case show that he is. Well, wouldn't the limit of your argument be – let me make sure I understand. Mr. Chahaza – am I saying it right? Yes, Your Honor. Mr. Chahaza, his only restraint, as you say, is that he's got to show up for court hearings, right? Respectfully, Your Honor, that is not the only restraint. Well, also that he has to let people know if he changes his address within five days. I mean, that doesn't really impede his movement, does it? Well, Your Honor, there is also the additional restraint on Mr. Chahaza by virtue of the fact that he was previously detained by immigration authorities, that he is subject to being re-detained at any time, for any reason, by the Immigration and Customs Enforcement Agency. So anybody who's ever been detained previously is in custody? Your Honor, to the extent that they are in proceedings, and to the extent that they are still subject to, as Mr. Chahaza is, to the regulation, to ICE's regulation stating that they can be re-detained at any time, and that would satisfy what the government has stated as an enmity requirement, that yes, that they would satisfy the in-custody requirement for purposes of habeas jurisdiction. I think if you look at Mr. Chahaza's case in total, this is a different situation, and these are restraints on him that are not shared by the public generally, because it is not every day that the BIA reopens, without any new evidence, a final order that it made years previously. Sure, but that's not the argument. The argument you're making goes way beyond his specific case, which I guess is why I'm a little surprised that you're pressing it this hard. I mean, it occurred to me that you've got the declaratory relief position you can take. Perhaps you could say under the Administrative Procedures Act, you've got all by itself right there, you've got a federal question jurisdiction argument that you could be making. I'm wondering why you're leaning so hard on in-custody when the ramifications of what you're asking for go substantially beyond Mr. Chahaza's case, and if we were to say the things you would like us to say, would they not likely to be cited back to us by criminals saying, hey, I've got to show up for my preliminary hearing. I'm really in custody. I've got a habeas position I want filed. I mean, aren't you pushing us out on a limb where you really don't need to push us? Your Honor, respectfully, I don't think that we're asking the court to go out on a limb. Specifically, we've cited cases from the district courts in California where the restraints were strikingly similar to those that Mr. Chahaza is subject to at this time, specifically the Shake case and the Sandoval-Bella case. It would not be a stretch for this court to look at the facts of this case, especially considering the fact that habeas is not overly formalistic and that it is designed when there are potential miscarriages of justice to prevent those miscarriages of justice. It would not be asking this court to extend custody to everyone if we were simply to look at the facts of Mr. Chahaza's case and see that it fits within case law with which the government doesn't even disagree. If we, for sake of argument, didn't see it the way you saw it, is the case over for you on this in-custody piece? Your Honor, our case is not wholly contingent on our petition for habeas corpus. We also have outstanding prior school relief under declaratory judgment and a writ of mandamus, which the court below did not address. So why don't you, if you wouldn't mind, why don't you shift to the argument that even if there were a basis in habeas or in one of these others that could arguably exist, that 1252B9 and 1252G just knock you right out. You can't get ahead on that. Yes, Your Honor. I'll take 1252B9 first. 1252B9 does not preclude Mr. Chahaza's case because it only applies where there is a final order of removal. And to hold otherwise in this case would mean that the BIA could reopen on a whim at any time without an individual ever having recourse. What happened to Mr. Chahaza here is that, again, his case was final in 2004 after the BIA reviewed the exact same records and now the BIA has reopened his case. Is your argument that under 1252B9 you may come to this court, as a jurisdictional matter, you may come to this court after a final order because there was a final order at one point and you're free to come here now? Is that it? Your Honor, looking at this case, the facts and circumstances of this case, we would submit that yes, essentially because Mr. Chahaza fully litigated his case, because he had a final order and the BIA reviewed this exact record, that this is the type of case that judicial review was meant for because without it and without federal court intervention, Mr. Chahaza potentially is going to be forced to litigate his case over and over and over again unless he loses. And that can't be the result that Congress envisioned or that courts envisioned. So to put it simply, Your Honor, 1252B9 doesn't apply to Mr. Chahaza's case. What about 1252G where it says the Attorney General's decisions about adjudication? Or amending proceedings for that matter. I will address them both. Under 1252G, first of all, in Mr. Chahaza's case, this is not a commencement of actions. The BIA's regulations state that an action can only be commenced, removal proceedings can only be commenced through a notice to appear, and that is clearly not the case here. This is a reopening of prior proceedings, so it puts Mr. Chahaza back in the place where he was previously. In addition, this is not an adjudication of Mr. Chahaza's case. What we're trying to prevent here, the harm that we're trying to prevent, is the re-adjudication of Mr. Chahaza's case. But isn't the purpose of 1252G regarding that commencing proceedings, isn't the purpose to preserve prosecutorial discretion about whether to pursue removal or not in a particular case? Yes, Your Honor. Why shouldn't that apply here? It doesn't apply here, Your Honor, because it would be a different circumstance if Mr. Chahaza hadn't litigated his case or if he had lost. But Mr. Chahaza fully litigated his case. He won a grant of asylum. The BIA reviewed the record, the exact same record that's before it now, and the BIA upheld the Immigration Statute's decision. And in point of fact, the Immigration, INS at the time, abandoned this appeal. But what we have here... It can't be the commencement of an action because it's the same action, right? Correct, Your Honor. It is the same action. It's reopened. The proceedings have been reopened. But what about adjudication? I mean, there's that separate part of 1252G where the statute says, hey, if the Attorney General decides to adjudicate something, not to put too fine a point on it, courts, you guys butt out. Your Honor, this is not... The three areas that are covered by 1252G have been held by the Supreme Court to be very narrowly read. And Mr. Chahal's case simply does not fall within that purview. The BIA has regulations for a reason, and they have regulations specifically governing when a case can be reopened and when a case shall not be reopened. And that is one of the issues here. ICE brought a motion to reopen, and ICE was subject to the BIA's regulations that said a motion to reopen shall not be granted unless there is new material evidence that was not and could not have been discovered previously. And ICE failed to meet that standard, and so it was incumbent upon the BIA to deny that motion. Instead, what the BIA did was the BIA improperly invoked a two-response authority to reopen Mr. Chahal's case when the BIA had already reviewed the exact same record. Sure. And we know what the facts are, but you said the Supreme Court has defined that very narrowly. Why don't you tell me about that? Tell us about that. What is it that the Supreme Court said that would cause us to read that in a limited way? Well, I think, Your Honor, I think with respect to adjudication of cases, according to the Supreme Court, the 1252G was created to prevent, for example, interlocutory appeals that might arise to contest the way that proceedings were being conducted. That is not the case here. Mr. Chahal's case has already been litigated, it has already been adjudicated, and what we have come before this Court for and have sought relief for is to prevent the re-adjudication of his case when his case was already final. And I think that is one of the key things that we have to keep in mind. This case was final. The BIA reviewed Mr. Chahal's case and actually had the noble review authority to review his case. The BIA had from 2002 until 2004. It looked at his case on the exact same record. The government doesn't contend that there are no new facts alleged. And the BIA looked at this case and it said Mr. Chahal's asylum grant should be upheld. And the BIA should be held to its own regulations. ICE was required to follow the requirements for reopening under the BIA's regulations, and the BIA should not be able to circumvent those regulations and abuse discretion by invoking its response authority. I have one more question if my colleagues won't indulge me. Yes. You make much of the BIA having a standard for reopening sua sponte, and that it has to be exceptional circumstances. And my question to you is, since one of the things the BIA said was, it appears to us that the immigration judge was not impartial. Would that not be an exceptional circumstance to have a decision maker who was apparently not impartial making a decision? If the BIA had a basis for saying that, would that not fit the BIA's own standard of exceptional circumstances? Respectfully, Your Honor, there is no way in this case, looking at the circumstances of this case, that the BIA's explanation that there was somehow bias on the part of the immigration judge could possibly, in this case, possibly constitute an exceptional situation because that actually was a basis for the appeal. Hold up. You're answering a different question. My question to you is not whether they're right that she was biased, but whether, as a legal matter, it would constitute an exceptional circumstance if there were a biased decision maker below. Your Honor, I can't speak to every situation, and I think it would depend on the facts and circumstances of that case and what the BIA has said about whether or not that constitutes an exceptional situation, but what I will come back to is that… This judge wasn't. I mean, I understand. Your position is this judge wasn't. That's clear. And it was also raised below, and the BIA had that, and reviewed that case between 2002 and 2004. Thank you. Good afternoon. I'm here to support Erez Rivani on behalf of the athletes. How do you say your name again, sir? Erez, that's E-R-E-Z.  R-I-V-A-N-I. Your Honor, this case raises important threshold questions about the enforcement of the Immigration and Nationality Act. There are four separate jurisdictional hurdles, each of which alone, if an appellant fails to satisfy, kicks this case out of federal court on a jurisdictional basis. I'd like to begin, although the court below is focused on caveats, with section 452b-9 and section 452g. It's important to understand that those amendments to the INA in 2005, I believe, affected a sea change in the application of habeas corpus relief in removal proceedings. Prior to 2005, the habeas proceedings occurred in tandem with appeals to the federal courts of appeals, and such piecemeal litigation occurred in removal proceedings. In this court, in Bonamentering, 2005, discussed that the whole point of the amendments was to end the piecemeal litigation, that there would be one bite of the streamlined apple, so to speak, in the court of appeals after a final order of removal. The appellants looked to section 452b-9 and 452g, suggesting that there must be a final order of removal before those provisions kick in. That's what the Supreme Court said in St. Cyr, isn't it? Respectfully, St. Cyr is a pre-realized case. It applies to a regime that still allowed habeas review for removal proceedings piecemeal prior to a final order of removal. Well, nothing in the 2005 amendments changed the point about 1252b-9. I mean, 1252b-9 and 1252g weren't amended in 2005, were they? Respectfully, they were. They were specifically amended to strip the courts of… I apologize. There was the addition of the habeas paragraph in 1252b-9. That's right. But 1252g was not, nor was the other language in 1252b-9, right? I believe… I'm unsure about 1252g, but our argument wouldn't depend on that. 1252g combined with 1252b-9… So, assume there's no… We agreed with you about they're not in custody. We're talking about some other jurisdictional basis, either the ADA or the Declaratory Judgment Act. So, we're not talking about habeas relief. We're talking about general jurisdictional issues here. What is it about the 2005 amendments that changes this statement in St. Cyr? Quote, its purpose, that is, 1252b-9, is to consolidate judicial review of immigration proceedings into one action in the Court of Appeals, but it applies only with respect to review of an order of removal. What's different is that in 2001, is that when St. Cyr was making that statement? Yeah. Individuals could still go to the district court, challenging removal proceedings during those removal proceedings or even at the end of removal proceedings before going to the Court of Appeals. I'm not following your logic, because this court is not speaking to whether or not they can go to the Court of Appeals directly or not in the context of this statement. This statement is reflecting what the Supreme Court says 1252b-9 means when it says you have to interpret it in light of 1252b. If you've got to interpret it in light of 1252b, that's as true today as it is in 2001, isn't it? Respectfully, no. In 2005, what the Real ID Act did, and this is in the legislative history, it's discussed in the Aguilar case, which is the most thorough treatment of the issue that we refer to in our briefs outside of the First Circuit. What the Real ID Act sought to do is to preserve habeas solely for one type of cause of action, where the individual is contesting the conditions of their physical custody. That's in the legislative history, that's in the Aguilar case, but following, after 2005, what needs to occur, what Congress envisions is the aliens challenging the removal proceedings when it goes through the removal process. The Aguilar Court referred to this as administrative exhaustion. This Court has referred to it as jurisdictional exhaustion in a pre-Real ID case as well. But either way, what the Real ID Act did is not strip the courts of jurisdiction, it just told the courts when they may consider certain types of claims. What it sought to do was end claim splitting between peace and litigation at the habeas level of the district court and on appeal after a final order of removal. What it does is channel all claims to the courts of appeals after and only after a final order of removal. Until that final order of removal occurs, someone exhausted their release. How can it be the case that, or maybe it's better for me to ask it this way, are you not making an argument then that this is the type of thing which is beyond judicial review? It's capable of repetition yet evading review, right? I don't believe so, Your Honor. This is reviewable without a doubt, but not at this stage in litigation. That misses what their argument is. Their argument is not that, hey, I'm not subject to a removal proceeding. It's, hey, I had a removal proceeding, and there's no reason, and I have a final order, and it's a final order in my favor. And, therefore, to put me back in the cycle for no reason except they can is to effectively say they can keep doing this to me forever until they find an I.J. they like and that that can't possibly be what the Congress had in mind. Now, you say, and I think there's more than a little irony in this, appellant is scheduled to appear before an immigration judge for his removal proceeding April 27, 2011. At that time, you may address the issues, et cetera. And, quote, that will end the matter. By your logic, it won't end the matter by any stretch, because if the I.J. says the same thing that was said last time, you can go back and do it again, right? And if the I.J. after that says it, you can go back and do it again, right? Respectfully, absent some showing on the record that there's irregularity on the administrative level, we take the board and the I.J. at their word and assume that they're acting in good faith. They'll be able to go before the I.J. Answer my question. When you say, I didn't suggest that they weren't acting in good faith, I'm just saying by your logic and as your opponents argue, there's no end to that cycle, is there? Logically, there's no end to that. No matter how good faith they're acting in, if they want to keep doing it, they can keep doing it, right? There can never be finality. This is theoretical more than practical in the sense that what will occur here is the new issue that was raised by the V.I.A., whether there was unfairness in the proceedings and whether pursuant to the affidavit that was submitted before the board with ICE's motion, which was later relied on in response to reopening, that this particular individual, they could not determine whether this person was a national security threat at that time. These are the things that will be reviewed and litigated before the I.J. then goes up to the board and then will come here and appeal. So you're saying, if I'm hearing you right, you're saying that logically, there's not an end to this process, but don't worry because we wouldn't do that. No, I don't think so. I can see the argument being made, but if there was nothing new at all in the record, which we dispute can be reviewed on a sui sponte case under the circuit's precedent, but if there was nothing new, that may be a concern. There is, in fact, new material here, which although may not have been reviewed. Is that a seal or something? It's what was in the affidavit that was submitted in 2007 by an FBI agent in which they stated, despite the five years of review, they cannot at this time determine whether this individual is, in fact, a national security threat or not, such that he could not pursue adjustment at this stage, he could not naturalize and so on. That was all information, according to your opponent on the other side there, that they had before, and I read Agent Alicia's affidavit, and I was having a hard time seeing something that wasn't said before. Is there something new in his affidavit that wasn't said before, or is it just a different conclusion? I believe what they considered new is this conclusion that they, at this time, cannot determine this individual is not a national security concern. How can one ever disprove a negative? I mean, if the FBI comes back and says, the information is the same, but we can't say there's not a security threat, is there any response that a person can make to that? In the removal proceedings, should they occur, the government will be held to its burden to meet that assertion. They won't just rely on simple, I said so, therefore we win. They're going to be required before a neutral arbiter to present evidence. That neutral arbiter will reach factual conclusions, the board will review those factual conclusions, and then we'll be back in federal telecourt if necessary. But the entire, short-circuiting that entire process misses the whole point of the 1262B9 and 1262G amendments to the INA and the Real ID Act. There is a time and a place under those amendments for these claims. That time and place is before the IJ, then before the board, then before this court on appeal. And if I may move for a moment to the sua sponte question. The appellants appear to ascribe some sort of questionable motive to the BIA. They may reopen and reopen and reopen and act in this infinite loop that you just alluded to, Your Honor. We presume that the agency acted at their word, there's a presumption of regularity. What they've done here under this circuit, and there's many cases in this circuit on the subject, absent two limited exceptions that don't obtain here, that issue is not reviewable in federal court. Well, you ought to respond to your opponent's argument in briefing that every case you've cited is a case in which our court or another court has said we can't review a decision not to reopen sua sponte, and that that's functionally different from a decision to open sua sponte, specifically citing Heckler v. Cheney and the discussion in there about the difference between a court acting and a court not acting. So why don't you address that point? They say you have no case on point because they're all on the negative side, none of them in a circumstance where the BIA acted. What's your argument? I would respond to that in two ways. First, in subsequent 28-J briefing and letter form, we submitted a case, Suarez 2008, unpublished decision, that addressed the affirmative granting of reopening as opposed to the denial of sua sponte reopening. Second, we addressed the party of the justice in a second 28-J letter, the Plumy case, a recent case out of the Third Circuit. Brilliantly written, right? It's Judge Jordan's opinion. Well, we like the case. I kind of like the case as well. The case there discussed the general proposition that reopening, whether it's granted or denied, is not subject to judicial review. What occurred in the Plumy case, the court addressed a limited exception. Was there a legal error? Did the board misunderstand the legal scope of its discretionary authority? If that is the case, the court has limited jurisdiction to address the scope of the correct legal authority and remand for the board to exercise that authority. But, and if I may quote from there, or I guess I'm paraphrasing here, on remand, the BIA would be free to deny or grant reopening sua sponte, and we would have no jurisdiction to review that. Well, let me ask this. Is there not a difference? When you say there's no jurisdiction to review a denial, that's always in the context of, has been said in the context of we don't have any standard to measure that against. Here there is a standard, as your opponent is saying. It's the exceptional circumstances standard. Doesn't that make a reasoned difference, a reasoned distinction? I think the court's decision in Plumy speaks to that as well. There is this language, exceptional situation, that appears in four decisions discussing the standard for reopening. It doesn't appear in the regulation. It's a construct that the board is applying its authority. But it's got the force and effect of law in the sense of it is a standard by which the board acts, right? Well, that's right. And if I may refer to Plumy again, there the court identified only one situation in which exceptional circumstances had been articulated in a consistent case-by-case manner in which the court could reasonably find that the BIA had cabined its discretion under that standard and provided a meaningful standard for the court to apply. That's in the board's decision of in route tickering, which addresses an aggravated felon's removal when his underlying conviction has been overturned in the duration of his removal proceedings. Because there, there is a standard to apply because the board has provided one case after case. This follows from the general principle in administrative law, where if the agency cabins its discretion that's otherwise discretionary, then a deviation from that is reviewable. We may remand to the board to explain the discrepancy from previous practice. What's the backstop? Is there any backstop at all, Mr. Rouveni, to the infinite loop? Is there a due process argument that can be made? And if so, at what juncture would a person make it? I guess I'm going back to a question I've asked before, but I don't feel like I've understood your answer. Is there no point at which an immigrant could say, hey, they're just not treating me fairly, make them stop? We would believe that point, again, is in the removal proceedings, where there will be an evidentiary hearing where the government will be put to its burden and be forced to represent what it claims are these national security interests. That can be done in camera. That can be done in testimony. Yeah, but isn't that going to break the, I mean, the petitioner here already is, I mean, he's got some problems with debts and all. I mean, eventually you'll run out of money. You won't be able to defend yourself, right? You keep having to go through this exercise. So there's got to be a final point, right? Well, every point of finality must be reached. I don't believe it appears here in this case. We have to figure that out, though, right? I mean, you seem to be making the argument that, yeah, there's no end in sight, but don't worry about that. And I guess I'm trying to figure out if I'm understanding that argument right. If that really is your pitch, if your argument is it's true this could go on forever, but don't worry, we wouldn't let that happen. Frankly, that's your paraphrasing of our argument. I wouldn't say it is. What is the end point, then? I've heard you say we have to presume they'll act in good faith, but that's the only thing I've heard you say in this regard, and that sounds to me like trust us, and that's what I'm trying to belly up to is if it's true that your position is, yes, as a logical matter, this could go on forever until the BIA gets it to an IJ who will rule against them. As a logical matter, that's true, but don't worry about it. Then that's all I want to hear you say. If that's your position, that's your position. But if you've got a reasoned argument for why that isn't a risk, I really want to hear it. Generally, when an accusation is made that they're acting in bad faith, that they're doing something for ulterior purposes, that they're not doing what they're supposed to be doing in a fair and consistent manner, we can find that in the record. We point to it. We look for it. Until that point has been reached, the concern about an infinite loop isn't just a theoretical concern. Once that point is reached and it comes back to the Court of Appeals, they say, look, we presented our case. We have the evidence here. This is an incorrect legal premise. Then that's your backstop. But we haven't reached that point yet. That's our backstop. How would they raise it? I guess that's what we're going back over tonight. I don't mean to try and make colleagues' patience worry worse. But how do they raise it? Because your argument is you don't have jurisdiction to look at that ever. At this point. Well, at what point? Assume this went four or five iterations down the road. What would prevent your colleague from main justice coming up here three years from now, four or five iterations down the road, and saying, well, you still don't have jurisdiction to look at for the same reason we told you back in 2011? Let me compare it by analogy, because I'm actually over my time here, to say other non-final orders that occur in the removal process, a decision to reopen, a decision to appoint counsel, decisions that are not immediately reviewable and are only reviewable once the administrative process articulated by 1252B9, 1252G, and the court's general exhaustion doctrine is exhausted. Once that's all taken care of here, the court will be able to, on a new, fresh record where this new evidence is tested, reach that decision. If there are no more questions. Thank you. Thank you. Thank you. Could you tell us, as a practical matter, why your adversary's response to Judge Jordan's question is wanting? Yes, Your Honor. Thank you, Your Honor. The reason that we're here is because Mr. Chiazza has already been through the process that the government speaks of. The government would now have Mr. Chiazza go through these removal proceedings again, and the only justification for that is, well, the government can meet its burden this next time. But what we need to do here is we need to look at the circumstances of this case and what happens, as the court is rightly concerned about, if there can never be an end to removal proceedings in the event that someone wins and prevails, and in the event that, to the extent that there is a motion to reopen that is brought by the government, that the government is not held to the same standards as an alien would be held to if they were brought a motion before the court for reopening. That is what this case is about. Mr. Chiazza has been through removal proceedings. He was granted asylum in 2002. The government appealed. The government, I would also highlight, Your Honor, is that at the time, one of the bases for Mr. Chiazza's granted asylum was actually the security grounds, the 9-11 security grounds, that the government now says is a reason that they can't rule out Mr. Chiazza as a national security risk. Mr. Chiazza voluntarily came forward to offer information about the 9-11 hijackers. And then he was detained, right? And he was detained as a material witness and then released. And in the hijack decision, the immigration judge said, the FBI has found that you are not a danger, you are not a national security risk, and we thank you for coming forward. So that was fully litigated. Those facts were known. And as the court rightly points out, there is nothing in Agent Alessia's affidavit that shows that these facts were not known and could not have been discovered previously. There is nothing new or material here, either with respect to alleged national security threat posed by Mr. Chiazza or in terms of misrepresentation, which was the other basis of the government's motion to reopen. The bottom line here is that all of this was laid bare, not only before the immigration judge but by the Board of Immigration Appeals. The Board of Immigration Appeals had de novo review power over Mr. Chiazza's case, and it chose on the record, the exact same record, to uphold the immigration asylum grant. ICE did not meet its verdict, and to the extent that this case is allowed to go forward and Mr. Chiazza is forced to relitigate his claims once again, that will send the message that no matter who prevails, no matter how long it's been, if the BIA, if ICE can't meet its burden, the BIA can step in, the BIA can invoke and co-respond to the authority, thereby insulating its decision from review, and you will have no recourse, you will have no choice but to be that hamster on the wheel again and again and again, perhaps. So what we ask this court is that Mr. Chiazza has shown, whether it be through habeas corpus, whether it be through declaratory judgment or writ of mandamus, Mr. Chiazza has shown that his case is properly before the federal courts of review, and we respectfully request that this court reverse the district court's ruling and remand for a decision on the merits. Thank you. Thank you, counsel. We thank counsel for their excellent briefing and argument, and we'd like to especially recognize counsel for appellants who took this case pro bono. They did an excellent job, and the court is especially appreciative of folks who come forward to render pro bono service, so thank you so much for doing that. The clerk will adjourn court. Thank you.